PIONEER REDUCTION CO. v. BEEDLE et al.

(Circuit Court of Appeals, Ninth Circuit. October 6, 1919.)

No. 3181.

1. SPECIFIC PERFORMANCE ⟨⟩121(1, 11)—EVIDENCE INSUFFICIENT TO SHOW ENFORCEABLE PAROL CONTRACT.

Evidence *held* not to establish an alleged parol agreement between the parties to share jointly in an enterprise with such certainty as to warrant specific enforcement, and also to show that, if made, complainant was chargeable with bad faith in acting under the agreement, which barred it from equitable relief.

2. SPECIFIC PERFORMANCE ⟨⟩121(1)—PROOF OF PAROL AGREEMENT MUST BE CLEAR TO BE ENFORCEABLE.

In a suit for specific performance of a parol contract, the evidence must be clear and satisfactory, both as to the existence of the contract and as to its terms.

Appeal from the District Court of the United States for the District of Nevada; Edward S. Farrington, Judge.

Suit in equity by the Pioneer Reduction Company against F. C. Beedle and the Belleville Tailings Association. Decree for defendants, and complainant appeals. Affirmed.

This was a suit in equity, which resulted in a decree in favor of the defendants thereto, and the bringing of it here on appeal by the complainant below. The subject-matter of the controversy is a dump of tailings alleged in the bill to have amounted to about 150.000 tons, one-fifth of which is alleged to have been owned by the Rhodes Mining Company, a California corporation. and the remaining four-fifths by the Argentum Mining Company, an Arizona corporation, of which tailings both the complainant and the defendant Beedle had some knowledge, as well as a desire to acquire them to work for profit. The record shows that three-fourths of the stock of the complainant corporation was owned by Benjamin Hall and the remaining one-fourth by Nicholas Snell, its superintendent—Hall being its president and in control of its operations.

The bill alleges that on or about December 23, 1913, the complainant and the defendant Beedle agreed that the complainant should enter into negotiations for the purchase of the tailings from the owners, and, in the event a purchase could not be effected, for a contract to work them on a royalty basis—which negotiations should be conducted in the name of the complainant, both parties to the agreement, however, to use their joint efforts to secure the tailings, and, if secured, to work them jointly—sharing equally in the expenses and in all profits arising from their treatment and reduction; that in pursuance of that agreement the complainant communicated to the defendant Beedle the results of certain assays and tests which it had theretofore made of the tailings and proceeded to enter into negotiations with the owners of them; that in January, 1914, complainant caused the tailings to be measured, sampled, assayed, and tested at an expense of about $750, and thereafter communicated to Beedle the progress of its negotiations therefor, and that in March, 1914, it reached an agreement with the owners by which the complainant was to have the right to work the tailings on a royalty basis of 45 cents a ton, which agreement was reduced to writing, but not executed; that notwithstanding those facts, of which, it is alleged Beedle was fully informed, the latter on April 3, 1914, entered into a contract with the owners of the tailings by which he was granted the exclusive right to work them on a royalty basis of 50 cents per ton, or to purchase them for $75,000, in consequence of which the owners refused to execute the previously drawn contract with the complainant; that this action on the part of Beedle was clandestine-

ly taken by him for the purpose of defrauding the complainant, and in violation of the alleged agreement of joint adventure; that the defendant Beedle and his codefendant and successor in interest, Belleville Tailings Association, though frequently requested, have refused to fulfill or comply with the terms of the alleged agreement of joint adventure, or to admit the complainant to any participation in the said alleged contract of April 3, 1914; that in May, 1914, the defendant Beedle organized the Belleville Tailings Association as a joint-stock company, to which he soon thereafter made a pretended conveyance of the said tailings and of all his rights under his contract with the said mining companies, the capital stock of which association was divided into 100 shares, of which 36 were issued to Beedle and 59 to other persons, who paid no consideration therefor; that in October of the same year the said Tailings Association was incorporated, and succeeded to the rights and interest of the said joint-stock company; that the defendants to the suit are engaged in reducing the said tailings, having already treated at least 50,000 tons thereof, extracting therefrom metals of the value of $150,000, from which they have realized a profit of $50,000 or more; that in addition to his dividends the defendant Beedle has received $300 a month since May 1, 1914, out of the profits arising out of the treatment of the tailings, one-half of which the complainant alleges belongs to it; that efforts are being made to sell stock of the said association to persons who may not have notice of the complainant's alleged rights; and that if the defendant corporation is permitted to declare and pay a dividend it will be impossible to recover the same, for the reason that some or all of such stockholders are insolvent. The prayer of the bill is, among other things, for an accounting, an order restraining the defendants from treating the tailings or disposing of them, and enjoining the defendant Beedle from disposing of any stock owned or controlled by him in the defendant corporation, and restraining the latter from declaring or paying dividends, and also praying for the appointment of a receiver of the property.

The answer of the defendants, in addition to setting up various affirmative defenses, put in issue, among other things, the alleged contract of joint adventure, and the alleged negotiations for the tailings by and in the name of the complainant, as also the allegations that the latter communicated to the defendant Beedle the results of any samplings, assays, or tests thereof, and the alleged expenditures by the complainant of any moneys growing out of such negotiations, and also denied that the complainant ever reached any agreement with the owners of the tailings for the working or treatment of them, or that the defendant Beedle's contract with the owners was executed clandestinely or in fraud of the complainant.

Miller & Mashburn and A. Grant Miller, all of Reno, Nev., and James Snell, of Grass Valley, Cal., for appellant.

Augustus Tilden, of Reno, Nev., for appellees.

Before GILBERT, ROSS, and HUNT, Circuit Judges.

ROSS, Circuit Judge (after stating the facts as above). [1] There are several reasons why we think the judgment of the court below right, and that it should be affirmed: First, because of that firmly established principle that every party coming into a court of equity, seeking any sort of relief, must do so with clean hands. Hall's own testimony shows very clearly that he was far from doing so, and that he was the active and exclusive agent of the corporation complainant in all of the transactions he practically admits.

Whether the agreement alleged as the basis of the suit be treated as a joint adventure or a partnership, it is obvious that each party to it was bound to observe good faith, and to disclose to the other all of the facts and negotiations regarding their common undertaking.

Prior to their preliminary talk, or agreement, if it may be so termed, which was December 20 or 23, 1913, both Hall (acting for the complainant) and Beedle knew of the tailings in question, had taken samples, and made tests of them, and each had been and was desirous of acquiring and working them, if satisfactory terms could be obtained. In all they had four conversations regarding the matter, at none of which was any third party present. Beedle at the time was working, at a place called Columbus, a small lot of tailings which came from the same mines—Candelaria mines—as the tailings in question, which were located at a place called Belleville. After stating his acquaintanceship and former friendly relations with Beedle, Hall gave this as the substance of his first conversation with him about the matter:

"I asked him how he was getting along with a small lot of tailings he was working at Columbus, Nev., and he said he had about finished them. I stated we were going to take over the Belleville tailings, if we could get a satisfactory price on them. He stated, 'I have been figuring on the Belleville tailings, too.' I stated it would be foolish to figure or bid against each other; it would be better for us to go in together and buy them outright. He says, 'I have not got money enough to buy them outright, but I would be willing to go in with some one who has money enough to buy them.' He said there wasn't much profit in handling small lots, as he had been doing, and that the Belleville tailings was a very large lot of tailings, and it would be worth while, and we ought to make some money out of them; and I said I thought we would do very well with them; and I asked him how far it was from where he was working his tailings to Candelaria, and he told me. * * * I told him what results we had got from our samples; that we had had some samples from the Belleville tailings that had been taken by Mr. Porter. We had made some further tests on them, and gave him the result of the tests; told him we had obtained from 90 to 100 per cent., practically, of the gold, and from 50 to 55 per cent. of the silver; and he stated, that is just what he had been obtaining on the Columbus. He says, 'The silver will not let go;' then he spoke about the plant he had at Columbus that he had been using, and asked if we would be willing to use it. I says, 'Certainly, we will take anything you have over there as part of the expenses; we will use anything you have over there.' We spoke about the treatment of the tailings, about how they would work, and what he thought it would cost. The conversation was quite lengthy. * * * I told him that our assays on the tailings were about a dollar in gold and probably ran about eight ounces in silver. * * * I also stated to him about what I thought we could buy them for, about $30,000 or $40,000 if we paid cash, which would bring them down to about 40 cents per ton. I stated to him about what my idea was about what it had cost us to handle similar material at a plant we were operating in Sutter Creek, told him we had done very well on those tailings, and told him to come out to the works and see us. I stated to him I thought we could handle them at about the same price as on Sutter Creek, on account of handling so many more tons a day. * * * He stated that he would be glad to get in with us, take an interest with us, and he wanted to know if we would take his plant, and I told him that we would use his plant as part of the plant, whatever we could use. I knew what his plant was; a small cyanide plant, as I understood; would handle probably 20 or 25 tons per day."

The substance of the next conversation, which Hall stated occupied a few minutes in January following, when Beedle came into his bank to get a check cashed, he gave as follows:

"In the first conversation he asked me if we had an option on the Belleville tailings, and I said, 'No;' that the tailings had been there a good many years. I didn't think it was necessary to procure an option, and that no one was

likely to come along at this stage and take an option that had not sampled them. * * * I stated that we would prefer to buy them for cash; that we had ample funds to handle them that way, and preferred to handle them in that manner, being more satisfactory to us, and probably to the other parties. It would give us an opportunity to handle the tailings whenever we felt like it; if we didn't want to run it wouldn't make any difference, was my idea. I was speaking for the Pioneer Reduction Company; I always spoke as 'we.' To the best of my recollection I stated to him it would be foolish for us to go and bid one against the other for the tailings, during the first conversation on the 23d of December, and that it would be better for us to go in together, because to bid one against the other would run the price up probably so there wouldn't be any profit for either of us. He answered, 'All right;' he would be glad to go in with us."

. Hall then related conversations that he stated he had previously had with Porter regarding the tailings and the amount for which he thought they might be purchased, and subsequent negotiations concerning the same tailings that he had had with one Lane, who, it appears from the record, was acting as a broker in the endeavor to dispose of them to the complainant through Hall, which negotiations with Lane were, according to Hall's own testimony, pending at the time of his first conversation with Beedle. The substance of Hall's third conversation with the latter is thus stated by him:

"After the conversation with Mr. Beedle in the bank, I walked home with him from town, from Nevada City, to where he was stopping, just across the street from where I lived, about ten minutes' walk, and we spoke about the tailings—the extraction. I asked him how long he was going to stay, and he stated he was going to San Francisco in a short time; but he didn't state where he would stop in the city, or what he was going for. I again saw him about ten days after that—it might have been two weeks—at the Good Friend Hotel in San Francisco. All these conversations were prior to the 3d day of April, 1914. In the conversation walking home from town in Nevada City, we spoke about the costs of treatment, and went over pretty near the same ground we had been over before, in regard to the cost, and the extraction, and costs of the plant. He stated he would be glad to go in with us, or glad he was going in with us; he would be pleased to join us as a partner in the enterprise; that was the understanding from his language. * * * I met Mr. Beedle in San Francisco by accident. I didn't know where he was stopping. I sat at the desk writing a letter in the Good Friend Hotel, and Mr. Beedle came, tapped me on the shoulder, and sat right opposite me; and I said, 'Hello, Fred, I didn't know you were here;' and he asked me how we were getting along with the tailings proposition, and I told him just as soon as we had things in shape I would let him know, and that Mr. Nick Snell and Gus Hoffman had gone over to sample them. I don't know that he made any reply; I don't recollect that he did; he turned around and went out. This was on January 17th, I think. During the conversation in Nevada City I said that we would go ahead with the negotiations, speaking for the Pioneer Reduction Company, and try and get them as cheap as we could. He informed me the cheapest price they had made to him was 60 cents a ton, and I had already told him before we thought we could get them for 40 cents. The Pioneer Reduction Company sent Mr. Snell and Mr. Hoffman to Belleville to sample the tailings. During the time they were sampling them, I went over there and assisted in measuring and estimating the tonnage. I was there about three or four days, and then returned to Nevada City. Mr. Snell and Mr. Hoffman remained there until they finished sampling the tailings, and then they shipped to the Pioneer Reduction Company at Nevada City about 600 pounds of samples. After they arrived in Nevada City, which was probably a week or ten days after we had finished sampling, we proceeded to make determinations as to the extraction, and approximate the cost of treatment in regard to the amount of chemicals that would be used; and

after finishing all our determinations, I went to San Francisco to see the Rhodes Mining Company, prepared to make them an offer for the tailings. The first offer that I made to them was 40 cents a ton, stating that the tonnage did not appear to be as much as they had informed us it was. We didn't think it was over, at the outside, 100,000 tons, and probably less than that; that in view of these conditions we thought 40 cents a ton would be a fair price. Mr. Lane, who was there at the time, stated that that was much cheaper than he thought they could be bought for. Mr. Lane and Mr. Scrivner were present. Mr. Lane was there first, and when I told him we would offer 40 cents a ton, we went to see Mr. Scrivner, who was the representative of the Rhodes Mining Company."

Mr. Scrivner, as appears from the record, was a lawyer, and, as stated by the witness, represented the Rhodes Mining Company, which owned an undivided interest in the tailings, and Judge Denson the record shows was the attorney of the Argentum Mining Company, the owner of the other undivided interest in them, the president of which latter company, and its representative was located at Colorado Springs. It appears without dispute that through those attorneys and Lane Hall was endeavoring to secure the tailings at the time he saw Beedle in San Francisco, and had the opportunity to convey to him all the information he had regarding the matter, and to which information Beedle was manifestly fairly entitled, if there was really any existing agreement between them. Hall's account of that interview is given above, which is in material conflict with the following account of it given by Beedle, after referring to a part of their previous conversation:

"I told Mr. Hall I was going away for a couple of weeks, and he wanted to know where I was going. I told him San Francisco. He wanted to know how long I would be down, and I told him a couple of weeks. He said he would be down in about a week, and he wanted to know, if we could make satisfactory arrangements for these tailings, if I would go over with him from San Francisco and sample them, and I told him I would if we could get an option on them. He said he didn't think any one would bother with them; they had been laying there so many years; and he said, 'I will see what we can do.' Our understanding was that I was to meet him in San Francisco, and we would go together to Belleville and sample the tailings. By satisfactory arrangement I referred to the price of the tailings, lease, and bond, and terms. I met Mr. Hall at the Good Friend Hotel in San Francisco January 15th or 16th. He said he had an option on the Belleville tailings for 30 days. He didn't say who he got it from. I said: 'How does this happen? You agreed to go to Belleville with me and sample these tailings; have you changed your plans?' He says, 'I don't know what I will do yet.' I says, 'You are not going to Belleville with me to sample the tailings?' He said, 'No, I can't go.' He told me nothing about the price of the option, from whom it was received, or any of its terms, or whether it was written or oral."

It is evident, we think, that neither Hall nor Beedle then considered that there was any definite agreement between them, but, if so, that each was acting in bad faith towards the other, in which latter event neither has any standing in a court of equity. This is, in our opinion, made perfectly plain by the fact that Beedle shortly afterwards, to wit, on April 3, 1914, without the knowledge of Hall, acquired a lease on the tailings for himself, through negotiations with the representative of the Argentum Mining Company at Colorado Springs, and by the

fact that Hall, according to his own testimony, 15 days after Beedle had obtained the lease, wrote this letter:

"F. C. Beedle, Goldfield, Nevada—Dear Friend: Have the matter of the Belleville tailings in such shape that I think we shall soon be in a position to start operations; am writing to you as I stated, to know what interest you wish to take with us and on what terms and conditions. Of course, you will understand that you come in at the same price as ourselves, actual cost. We have two other propositions, of equal magnitude, under way, and therefore shall be glad to hear from you as promptly as possible. I believe we can all do well on the Belleville tailings, under the condition of our option. With kindest regards to yourself and family, I remain."

The inquiry made of Beedle in that letter by Hall, to know what interest he wished to take with Hall's company, and on what terms and conditions, taken as written, is perfect confirmation of the contention on the part of the appellee that no definite agreement ever had been entered into between them respecting the tailings. But Hall in his testimony undertook to explain the inquiry by saying in effect that he deliberately made it as a "decoy" for the purpose of getting "an expression from Mr. Beedle of his conduct." If the purpose be conceded, it is not of a character to appeal to the favorable consideration of a chancellor, for courts of equity always require of all parties before them good faith and fair dealing.

As will have been seen from the statement of the case, the complaint alleged, among other things, that both parties to the agreement were to use their joint efforts to secure the tailings, and if secured to work them jointly—sharing equally in the expenses and in all profits arising from their treatment and reduction; that in pursuance of that agreement the complainant communicated to the defendant Beedle the results of certain assays and tests which it had theretofore made of the tailings, and proceeded to enter into negotiations with the owners of them; that in January, 1914, complainant caused the tailings to be measured, sampled, assayed, and tested at an expense of about $750, and thereafter communicated to Beedle the progress of its negotiations therefor.

Notwithstanding the foregoing allegations of the complaint, which was verified by Hall, and notwithstanding it appears from the evidence without conflict that Hall had promised to pay Lane $1,500 for his services as broker in the matter, had obtained quotations on tanks and for 15,000 feet of pipe, had caused the tailings to be carefully measured and sampled, sending 600 pounds thereof to Nevada City, and there worked and tested in many ways during a period of several weeks, there is, as said by the court below, nothing in the record even tending to show that Beedle was ever informed or consulted in respect to a single one of those proceedings on the part of Hall, except the statement of the latter in the interview at the Good Friend Hotel in San Francisco, that Snell and Hoffman had gone to Belleville to sample the tailings, and that Beedle would be informed as soon as things were in shape.

Whether or not such conduct on the part of Hall was sufficient, or any justification for the ignoring of him by Beedle in obtaining the lease for himself, it is unnecessary for us to decide. What we

hold is that the conduct of Hall, acting for the appellant, was such as to preclude a court of equity from granting it any relief.

[2] Moreover, it is not even contended that the evidence shows that there was anything specific or definite in respect to the alleged parol agreement. We think it unnecessary to cite the many authorities that might readily be cited to show that the court below did not err in holding that in such a case it is essential that the evidence be clear and satisfactory, both as to the existence of the contract sought to be enforced, as well as to its terms, and in accordingly denying the decree for specific performance thereof.

Entertaining these views, we need not make reference to any of the other points made and argued by counsel.

The judgment is affirmed.